*461 Lundberg Stratton, J.,
dissenting.
{¶ 47} The Power Siting Board is vested with an important public power, and it is frequently called upon to resolve disputes between major utility companies and ordinary citizens. Today’s decision allows the board to sidestep public scrutiny and judicial review whenever it desires. But the public’s business should be done in public, and that is not only common sense, it is the law. Therefore, I dissent.
I. The board and lead opinion have denied the citizens affected by this project their only opportunity to be heard.
{¶ 48} In our state, the power to oversee the construction and operation of major utility facilities has been given to one entity alone: the Power Siting Board. Local authorities — elected representatives, zoning commissions, county courts — have no say over whether, where, or how major power projects may be built and run. R.C. 4906.13. So when the neighboring landowners, appellants in this case, learned that Buckeye wanted to build wind turbines the height of skyscrapers only a few hundred feet from their land and homes, they went to the board, the only place they could go.
{¶ 49} The neighbors’ investigation of the project turned up some very real concerns. Take one for example: Wind turbines are very large machines, and machines can break down. One type of breakdown is known as “blade shear,” that is, a blade shearing off at the hub. Blade shear would present a serious risk of danger, to say the least. The blades are mounted over 300 feet from the ground, reach almost 500 feet into the air, and stretch half the length of a football field.
{¶ 50} Buckeye assured the board that a shorn blade could fly only 500 feet. That was only 41 feet less than the minimum setback from neighboring properties, leaving little margin for error. When the board’s staff asked Buckeye for supporting data, it turned out that Buckeye’s prediction pertained to a different, smaller turbine, and the company informed staff that “no such calculation existed” for the proposed turbines. Nevertheless, despite lacking either evidence or sufficient competence in physics even to attempt to calculate the distance a blade could fly, the staff member responsible signed off on Buckeye’s proposal. His portion of the investigatory report stated, “Staff believes that the Applicant has adequately evaluated and described the potential impact from blade shear at the nearest property boundary.”
{¶ 51} Understandably, the neighbors neither were satisfied with this investigation nor wanted to be the guinea pigs in a blade-shear experiment, so they took this issue to the board. But the board, rather than withhold approval of the project until safe setbacks were determined, approved the project. It simply required Buckeye to provide staff, and no one else, with the “formula” used to *462 calculate the distance a blade could be thrown. Since this same staff had lacked the competence to even attempt such a calculation in the first place, it is open to question what good providing such a formula would do. And the board did not require Buckeye or staff to share the formula with other parties, to file it in the public record, or otherwise to resubmit the issue for review, so no one else would ever be entitled to scrutinize Buckeye’s calculations.
{¶ 52} Thus, even though this appeal represents the final review of the final order of the board, we have no evidence that the project is being built safely away from yards and homes, and we never will. Yet the lead opinion affirms the order.[3]
{¶ 53} The law requires otherwise. The legislature has required the board to settle issues like this up front on a public record, and it specifically guarantees affected citizens the right to participate in the review process and to have their voices heard. See R.C. 4906.07 (requiring that the board hold public hearings), 4906.08(A)(3) (neighboring citizens are entitled both to party status and to call and examine witnesses), 4906.09 (requiring the board to keep a record of its proceedings), 4906.10(A) (requiring the board to make all substantive determinations before authorizing construction), and 4906.11 (requiring the board to issue a written opinion stating the reasons for its decisions). Issues are not to be settled after construction is approved, much less by unaccountable staff members without public scrutiny or judicial review. Yet that is precisely what the board, and now the lead opinion, has allowed.
II. The lead opinion does not offer any workable response to the denial of the citizens’ right to a public hearing.
{¶ 54} The lead opinion suggests there are three remedies now available to the neighbors, but none of them cures the problem. The lead opinion ignores the solution plainly required by law: give the neighbors their hearing.
A. The order plainly permits nonpublic proceedings.
{¶ 55} First, the lead opinion states that “[njothing in the order suggests that [staffs] actions would occur secretly.” That is simply not true. Each one of the issues challenged by appellants as improperly delegated allows the staff to resolve those issues either alone or in consultation with Buckeye alone. In re Application of Buckeye Wind, Pub. Util. Comm. No. 08-666-EL-BGN, at 83-84 (2010) (collection system plan, complaint procedures, and other issues), 90 (Blade *463 throw), 91 (relocation of turbines), and 92 (turbine model). The order does not require that notice be given of the time and place of any meeting with Buckeye. The order does not require records to be kept of these meetings. The order does not require that other parties be allowed to attend. The order does not require that materials shared at these meetings be shared with other parties. The order does not require that decisions be put in writing. The order does not require further review by the board. And the effect of all this is to avoid any further review by this court.
{¶ 56} This suggests secrecy in any meaningful sense. The lead opinion points to no provisions that cut the other way, i.e., that allow third-party participation or review. Although the board did not affirmatively order that its staff meet with Buckeye alone at an undisclosed time and place without keeping records or putting decisions in writing, it has allowed such secret meetings to occur.
B. The statute cited in the lead opinion offers the neighbors no protection.
{¶ 57} The lead opinion also suggests that the neighbors will have additional process before the board. But the order and the statutes point the other way.
{¶ 58} The lead opinion claims that the board did not foreclose the neighbors from providing input. This is not true. In fact, the portion of the order quoted by the lead opinion makes precisely the opposite point, stating that the neighbors have already had their chance: “Any party to a certificate application has an opportunity, as [the group of neighbors] has done in this matter, to oppose staffs recommended conditions or to propose additional conditions.” (Emphasis added.) The board’s appellate brief confirms this point. Rather than assure us that the neighbors will have any additional process, the board asserts that they have received “all [the process] that is required.”
{¶ 59} The lead opinion also states that there are statutes that give the neighbors “the right to file before the board if Buckeye violates its certificate.” It cites R.C. 4906.07, but that section does not authorize the neighbors to do anything; it authorizes Buckeye to file “an application for an amendment of a certificate.” Buckeye will never need to amend its certificate as far as the issues delegated to the staff are concerned. The certificate does not create a substantive standard to govern the project, but simply requires meetings with staff. So long as Buckeye meets with staff, it will not — it cannot — run afoul of the pertinent parts of its certificate. Where there is no rule, there can be no violation, and there will be no need for an amendment.
{¶ 60} Two other statutes, R.C. 4906.97 and 4906.98, do authorize the neighbors to complain to the board if Buckeye builds or runs its project “other than in compliance with the certificate [it] has obtained.” R.C. 4906.98(B). But the same *464 problem presents itself; as to the issues delegated to the staff, the certificate does not create any standard to govern the project. It simply requires a meeting with staff. Once Buckeye meets with staff, it has complied with the certificate, the staffs decisions will be implemented, and any complaint for a violation of the certificate would fail.
{¶ 61} Finally, even if the neighbors did have some mechanism to challenge staffs decisions in the future, that remedy would not justify disregarding the neighbors’ right to a hearing now. Realistically, overturning a decision after it has been made and implemented presents a higher hurdle than swaying a decision up front — it is always harder to unring the bell. And if the neighbors were somehow to prevail on a postconstruction complaint, this could impose significant costs on Buckeye.
{¶ 62} Suppose that Buckeye chooses a different turbine than the model analyzed at hearing; the order allows Buckeye to do so on the simple condition that it “provide assurances that no additional negative impacts would be introduced.” [4] Suppose that despite Buckeye’s assurances, the new turbine turns out to be loud enough that it violates the noise standards in the certificate. The neighbors would be legally entitled to have the turbines shut down, replaced, or removed. But surely the more efficient, cost-effective outcome would have been to analyze and reject the offending model before it was purchased and installed.
C. R.C. 4906.10(A) requires the board to resolve relevant, material issues before it grants a certificate.
{¶ 68} Finally, the lead opinion states that R.C. 4906.10(A) does not require that issues be “finally resolved by the board before a certificate may be issued.” This simply ignores the language of the statute.
{¶ 64} R.C. 4906.10(A) states, “The board shall not grant a certificate * * *, either as proposed or as modified by the board, unless it” makes the required findings and determinations. The default position is “shall not grant,” and that only changes when the board makes its findings and determinations. All of the issues delegated by the board related to one or more of those necessary findings. So, contrary to the lead opinion’s statement, the law required these issues to be resolved before the certificate is issued.
{¶ 65} The irony here is that the lead opinion, in making these points, seems to recognize that allowing unaccountable staff members to resolve issues in private is a problem. But it offers no workable solution to that problem. The necessary *465 solution is simply to reverse the order and require that accountable persons resolve these issues after following the public process required by law.
Van Kley & Walker, L.L.C., Jack Van Kley, and Christopher A. Walker, for appellants Union Neighbors United, Robert McConnell, Diane McConnell, and Julia F. Johnson.
Nick A. Selvaggio, Champaign County Prosecuting Attorney, and Jane A. Napier, Assistant Prosecuting Attorney, for appellants Champaign County and Goshen, Salem, and Union Townships.
Michael DeWine, Attorney General, and William L. Wright, Werner L. Margard III, and John H. Jones, Assistant Attorneys General, for appellee.
Vorys, Sater, Seymour & Pease, L.L.P., M. Howard Petricoff, Stephen M. Howard, and Michael J. Settineri, for intervening appellee, Buckeye Wind, L.L.C.
III. Today’s decision renders ineffectual the laws designed to protect the interests of citizens living near proposed utility projects.
{¶ 66} The outcome of this decision is unfortunate for anyone living near the site of a proposed high-voltage transmission line, electric substation, high-pressure gas pipeline, or generation plant. If the board runs into an issue that for whatever reason it does not want to deal with — or if it simply prefers to resolve an issue without the discomfort of public participation and judicial review — it now has a broad off-ramp. Approve the project now; work out the details with the company later. The public retains a formal right to participate, but it is up to the board whether that right amounts to anything more than a formality.
{¶ 67} This is not alarmist but precisely what happened in this case. If, as it did in this case, the power siting board can delegate the very siting of facilities— its core duty, the duty from which the power siting board derives its name — it can delegate anything and everything. The lead opinion identifies no enforceable limits on the board’s power to delegate but apparently trusts that the board will exercise its new discretion wisely. One can hope that the lead opinion’s trust proves well founded, but in my view, the public’s business should not be left to the unreviewable discretion of appointed staff members who are not accountable to the public. The board’s decisions should have to see and bear the light of day.
{¶ 68} For these reasons, I dissent, and I would reverse the order and remand this case for completion of the public proceeding required by law.
Pfeifer and Cupp, JJ., concur in the foregoing opinion.
*466 Larry Gearhardt, Chad A. Endsley, and Leah F. Finney, urging affirmance for amicus curiae, Ohio Farm Bureau Federation.

. This is not the only major issue that the board left unresolved. Among other things, the board approved this project but allowed its staff to approve new locations for several turbines. It also allowed Buckeye to use new turbines that had not been examined at hearing — even though Buckeye’s own witness had admitted on the record that if a different turbine were used than the ones that he had studied, his “whole analysis would have to be rerun.”

. In fairness, Buckeye also had to provide staff with copies of the safety manual and manufacturer contact information.